# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### WESTERN DIVISION

JERRY ALTMAN,

      Plaintiff,

vs.

CHARLES PALMER, et al.,

      Defendants.

No. 13-CV-4066-DEO

ORDER ON MOTION FOR SUMMARY JUDGMENT

## I. INTRODUCTION

This matter is currently before the Court on the Defendants' Motion for Summary Judgment, 13-CV-4066-DEO, Docket No. 25. The Plaintiff is an involuntarily committed patient (currently transitioning) at the Civil Commitment Unit for Sex Offenders (CCUSO) in Cherokee, Iowa.[1] The parties appeared for a hearing on October 29, 2014. After listening to the parties' arguments, the Court took the matter under consideration and now enters the following.

---

[1] The patients at CCUSO "have served their prison terms but in a separate civil trial have been found likely to commit further violent sexual offenses." Iowa Department of Human Services Offer #401-HHS-014: CCUSO, 1 http://www.dhs.state.ia.us/docs/11w-401-HHS-014-CCUSO.pdf, last visited March 23, 2015.

## II. BACKGROUND

This case has a complicated procedural history. On October 31, 2012, Mr. Altman filed a Complaint in 12-CV-4098-DEO. In his Complaint, Mr. Altman alleged that the Defendants violated his rights related to free exercise of religion, racial discrimination, and retaliation. On December 28, 2012, this Court entered an Initial Review Order allowing Mr. Altman's Complaint to proceed.[2] 12-CV-4098-DEO, Docket No. 4. However, the Court withheld ruling on Mr. Altman's Motion to Appoint Counsel until after reviewing the Defendants' responsive pleading. Id. On February 19, 2013, the Defendants filed a Motion to Dismiss along with documentation requested by the Court. 12-CV-4098-DEO, Docket Nos. 13 and 14.

While that matter was still pending, former Plaintiff Donald Phillips filed a Complaint in the above captioned case, 13-CV-4066-DEO. In his Complaint, Mr. Phillips alleged that the Defendants have violated his rights by denying him access to religious materials. On October 23, 2013, this Court

---

[2] The Court gave Mr. Altman time to clarify his racial discrimination and retaliation claims, which he did. 12-CV-4098, Docket No. 17.

entered an Initial Review Order allowing Mr. Phillips'
Complaint to proceed and appointing Attorney Hannah Vellinga
to represent him. Docket No. 3. The next day, the Court
entered an Order consolidating Mr. Altman's case with Mr.
Phillips' case, since they dealt with similar issues. Docket
No. 5.

The Court directed that the consolidated case would
proceed under caption number 13-CV-4066-DEO, and that
appointed counsel would represent both Plaintiffs. The Court
directed Ms. Vellinga to file an Amended Complaint covering
both Plaintiffs' claims. Appointed counsel filed a first
Amended Complaint, Docket No. 11, on December 6, 2013, and a
second Amended Complaint on January 9, 2014. Docket No. 16.
Meanwhile, the Defendants filed a Motion to Dismiss on
December 24, 2013, Docket No. 12, which they supplemented on
January 13, 2014, Docket No. 17, and again on February 11,
2014, Docket No. 19. Following a hearing, this Court entered
an Order granting in part and denying in part the Defendants'
Motion to Dismiss. Docket No. 22. Pursuant to that Order,
Plaintiff Phillips was dismissed from this case, as were any
claims against the Defendants in their official capacity. Id.

Following that Order, the Defendants filed their Answer, Docket No. 23, and then the present Motion for Summary Judgment, Docket No. 25.

## III.  FINDINGS OF FACT

There are very few disputed facts in this case.  As the Court stated above, Mr. Altman is a patient who has been civilly committed at CCUSO.  The Iowa Supreme Court set out Mr. Altman's history:

> [t]he record made at trial reveals that Altman was convicted in 1977 for lascivious acts with a seven-year-old girl.  He was found with his penis exposed in front of the child, whose pants had been pulled down.  His semen was found on the victim. In 2004 he was convicted of assault with intent to commit sexual abuse after he attacked a woman.  Altman's semen was found on the victim's panties.  Altman also had an extensive history of other criminal acts commencing with a shoplifting charge when he was eleven.  As an adult, he has had over forty arrests and multiple convictions, reflecting a life of substance abuse, assaultive behavior, and continual criminality.

In re Det. of Altman, 723 N.W.2d 181, 183 (Iowa 2006).  Based on that history, a "jury found the [Mr. Altman] was a sexually violent predator" and the state court committed Mr. Altman to CCUSO.  Id., at 184.

4

After several years at CCUSO, Mr. Altman advanced to phase five, transitional release, of the CCUSO treatment plan. Mr. Altman was in phase five from approximately 2010 through 2014. The state court granted Mr. Altman release with supervision status on June 5, 2014.[3] Under the terms, Mr. Altman was required to find work in the Fort Dodge, Iowa, area before leaving CCUSO, and, at the time of the hearing, that process was on going. Once released, Mr. Altman can live and work in the Fort Dodge, Iowa, area and will be supervised by a state court probation worker.

Mr. Altman was in transitional release or release with supervision during all the times relevant to this case. Patients in transitional release may attend church in the community, if permitted by the treatment team and the church. Patients must contact the Pastor in advance, disclose their sex offending history, create a safety plan, and receive permission to attend. Patients in transitional release must

_____

[3] Mr. Altman was granted release with supervision in April, 2011. The plan approved by the state court stated that Mr. Altman could transition into the Storm Lake, Iowa, area. However, Mr. Altman did not comply with the release plan and the state Court revoked release with supervision on October 17, 2011. Mr. Altman then returned to transition release at CCUSO.

request outings in advance, detailing the stops they intend to make and the reasons for them.

Mr. Altman's essential claim is that he wanted to attend church in Fort Dodge but CCUSO denied his ability to do so. Mr. Altman is Baptist, as is Pastor Stout, CCUSO's chaplain. However, the religious service at the CCUSO facility is nondenominational and Mr. Altman preferred a Baptist service.

Mr. Altman did attend a Baptist church in Fort Dodge once in 2010. He attended two different Fort Dodge churches in 2011. He also requested a number of Sunday outings to Fort Dodge that did not include a request to attend church, but instead involved family visits. In June of 2011, the treatment team cancelled Mr. Altman's trips to Fort Dodge because Mr. Altman's son, who lived in Fort Dodge, had been arrested for attempted murder.[4] Mr. Altman admits a number of his family members have trouble with the law.

In 2013, Mr. Altman began attending the Faith Bible Church in Storm Lake. Although there is a Baptist church in

---

[4]  It is a standard conditional release provision that parolees avoid persons associated with criminal activity. The Court is not comfortable with this situation in some instances, but is persuaded that, under the circumstances, it must work that way.

Storm Lake, Mr. Altman has never asked to attend that church. Other patients asked to attend, and the church declined to let CCUSO patients attend. Because other patients were declined by the church, Mr. Altman has not asked to attend the Baptist Church in Storm Lake.[5]

Mr. Altman's retaliation claim also arises out of being denied the trips to Fort Dodge.

Mr. Altman's discrimination claim has several prongs.[6] The first prong relates to a treatment team meeting that Mr. Altman's family participated in. During that meeting, Mr. Altman's brother made a comment that CCUSO was "running this place like a plantation." Mr. Altman alleges that his therapist took offense to that comment, and that he was required to ride in the back of the van in retaliation. The Defendant in question, Bryon Kelley, admits that Mr. Altman rode in the back of the van (once), but testified that another patient was also along and that patient took the front seat. Specifically, Mr. Kelley recalls no directives that Mr. Altman

---

[5] There is a dispute about whether Mr. Altman also attended some church services in Sioux City.

[6] Mr. Altman is African American.

7

was required to ride in the back of the van. Mr. Altman alleges no other retaliation.

Second, in January, 2011, CCUSO caught Mr. Altman with contraband movies.[7] He also had electronic equipment to copy movies. CCUSO told him to move the equipment to storage and Mr. Altman received a behavior report and a treatment assignment as a consequence. Mr. Altman complains that this consequence was harsher than the consequence to another patient, John Crane. Mr. Altman testified that Mr. Crane received similar, but lighter, punishment.

Another alleged discriminatory event occurred in April of 2011, during Mr. Altman's first release with supervision. Per the state court order, he was to obtain suitable housing in the community. In June, 2011, his AA sponsor met with CCUSO staff and was willing to have Mr. Altman move in with him. Then, the sponsor checked the sex offender registry and learned that Mr. Altman had lied about his offense history – Altman denied having child victims where the registry indicated he had a victim under the age of 9. The sponsor

---

[7] The movies were commercial films that had been illegally copied and distributed, a practice commonly referred to as pirating.

also spoke with his neighbors, who did not want him renting to Mr. Altman. CCUSO had a release of information, signed by Mr. Altman, to speak with the sponsor and allegedly did so. Following that incident, Mr. Altman was unable to find a landlord to rent to him. Mr. Altman complains that he was discriminated against because he could not find housing, and Ryan Hoffert, a Caucasian former CCUSO patient, did find housing. Mr. Altman testified that he had no information on whether Mr. Hoffert also had to disclose his offenses, which Defendants allege that Hoffert did. Defendants also state that the landlord in Marathon, Iowa, who rented to Hoffert, also rented to Clyde Hollins, another African American CCUSO patient.

Other relevant facts will be discussed below.

## IV. STANDARD

42 U.S.C. § 1983 provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action

at law, suit in equity, or other proper
proceeding for redress . . . .

Summary judgment is appropriate only if the record shows "there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P., Rule 56(c). A fact is *material* if it is necessary "to establish the existence of an element essential to [a] party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). There is a *genuine issue* as to a material fact if, based on the record before the court, a "rational trier of fact" could find for the non-moving party. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

When considering a motion for summary judgment, a "court must view the evidence in the light most favorable to the nonmoving party . . . ." Hutson v. McDonnell Douglas Corp., 63 F.3d 771 (8th Cir. 1995). This requires a court to draw any reasonable inference from the underlying facts in favor of the nonmoving party and to refrain from weighing the evidence, making credibility determinations, or attempting to discern the truth of any factual issue in a manner which favors the

moving party unless there is no reasonable alternative.  See
Matsushita, 475 U.S. at 587; and Morris v. City of
Chillicothe, 512 F.3d 1013, 1018 (8th Cir. 2008) (citing
Thomas v. Corwin, 483 F.3d 516, 526-27 (8th Cir. 2007).

Procedurally, the movant bears the initial burden "of
informing the district court of the basis for its motion and
identifying those portions of the record which show a lack of
a genuine issue." Hartnagel v. Norman, 953 F.2d 394, 395 (8th
Cir. 1992) (citing Celotex, 477 U.S. at 323).  Once the movant
has carried his burden, the non-moving party is required "to
go beyond the pleadings" and through "affidavits, or by the
'depositions, answers to interrogatories, and admissions on
file,' designate specific facts showing that there is a
genuine issue for trial.'" Celotex, 477 U.S. at 323 (citing
Fed. R. Civ. P. 56(e)).

## V.  ISSUES

In their Motion for Summary Judgment, the Defendants
raise several arguments.  First, they argue that the Plaintiff
has failed to allege a viable free exercise of religion claim.
Similarly, the Defendants argue that Mr. Altman has failed to
articulate facts to support his claims for racial

11

discrimination and retaliation.  Finally, the Defendants argue that they are entitled to qualified immunity.

## VI.  ANALYSIS

### A.  Religion Claim

Mr. Altman argues that CCUSO has violated his right to freely exercise his religion.  Specifically, as set out in the Complaint, Mr. Altman alleges that he:

> has been denied his right to freely practice his religion while in the custody of Defendants at the CCUSO.  The Defendants have repeatedly denied Altman's requests to attend his Baptist church in Fort Dodge, where he has attended in the past and which church's Pastor is a member of Altman's Relapse Prevention Plan Support Team. Altman is otherwise allowed to travel to Fort Dodge to visit family members that also reside in Fort Dodge.

Docket No. 16, p. 5.

In <u>Youngberg v. Romeo</u>, 457 U.S. 307 (1982), the Supreme Court of the United States held that the Fourteenth Amendment of the United States Constitution determines the rights of individuals who have been involuntary committed to a facility. <u>Id.</u> at 312.  Although residents at state institutions do have constitutionally protected interests, these rights must be balanced against the reasons put forth by the State for

restricting their liberties.  Id. at 321.  Inmates clearly retain their First Amendment right to free exercise of religion in prison, O'Lone v. Estate of Shabazz, 482 U.S. 342, 348 (1987).  It is obvious then that civil detainees also retain their First Amendment Rights.

In Turner v. Safley, 482 U.S. 78 (1987), the Court found that a prison regulation infringing on an inmate's constitutional rights is valid so long as it is reasonably related to a legitimate penological interest.  Id. at 89.  The Court also recognized that deference should be given to the decisions of prison administrators, especially when those decisions deal with issues of prison safety and security.  Id.

In Beaulieu v. Ludeman, 690 F.3d 1017, 1039 (8th Cir. 2012), the 8th Circuit applied the Turner framework to civilly committed patients' free speech claims.  However, in that case the parties agreed to the Turner framework, so the 8th Circuit did not precisely consider whether the Turner framework must be applied to civil detainees.  Regardless, many Courts have applied Turner in analyzing constitutional claims by civilly committed sexually violent predators.  See Thompson v. Vilsack, 328 F. Supp. 2d 974 (S.D. Iowa 2004)(Judge Pratt

13

applied Turner to a claim that co-payment for Kosher meals violated civilly committed sexual predator's First Amendment rights); see also Rivera v. Rogers, 2006 WL 1455789 (D. N.J. 2006)(applying Turner in analyzing claims of SVPs that opening of their packages violated their First Amendment rights); Willis v. Smith, 2005 WL 550528 (N.D. Iowa 2005)(Magistrate Zoss) (noting that status of sexually violent predators (SVPs) was substantially similar to that of prisoners and applying Turner to SVP claims concerning mail handling procedures); Gilmore v. Kansas, 2004 WL 2203458 (D. Kan. 2004) (noting Turner standard in regard to claims of denial of razors, lighters, electricity, use of a washer and dryer, and freedom to move about the facility); see also Hydrick v. Hunter, 449 F.3d 978 (9th Cir. 2006)(stating that "[a]s is the case with prisoners, civilly committed persons certainly retain those First Amendment rights not inherently inconsistent with the circumstances of their detention."). Recently, Judge Frank in the District Court of Minnesota introduced a slightly modified Turner test in the context of civil detainees' free exercise claims. Specifically, Judge Frank considered "each of [the] Plaintiffs' First Amendment claims in light of appropriate

therapeutic interests as well as relevant safety and security concerns." Karsjens v. Jesson, 6 F. Supp. 3d 916 at 937 (D. Minn. 2014). Accordingly, this Court will analyze the Plaintiff's free exercise complaint under the Turner framework as modified by Judge Frank.

Before the Court reaches, Turner, though, the Court must consider the threshold question of whether a free exercise claim exists. In a typical prisoner free exercise case, the Plaintiff must allege a substantial burden on his free exercise of religion. Patel v. U.S. Bureau of Prisons, 515 F.3d 807, 813 (8th Cir. 2008). Substantially burdening one's free exercise of religion means that the regulation

> must significantly inhibit or constrain conduct or expression that manifests some central tenet of a person's individual religious beliefs; must meaningfully curtail a person's ability to express adherence to his or her faith; or must deny a person reasonable opportunities to engage in those activities that are fundamental to a person's religion.

Murphy v. Mo. Dep't of Corr., 372 F.3d 979, 988 (8th Cir. 2004)(quotation and alterations omitted). In this case, the Defendants do not challenge Mr. Altman's allegation that his beliefs are sincere or that he alleges a burden. Rather, the

Defendants argue that their policy is reasonable under <u>Turner</u>.

"A discussion of constitutional violations in a prison setting requires a two-step analysis.  First, [the court] must determine whether the liberty interest asserted by an inmate is an interest protected by the Constitution.  If [the court] find[s] a protected liberty interest exists, [the court] must balance this interest against a State's interest in prison safety and security."  <u>Goff v. Harper</u>, 235 F.3d 410, 413-14 (8th Cir. 2000) judgment reinstated, 96-1018, 2002 WL 34541628 (8th Cir. Jan. 15, 2002).  Under <u>Turner</u>, a prison regulation that impinges on inmates' constitutional rights ... is valid if it is reasonably related to legitimate penological interests.  <u>Turner</u>, 482 U.S. at 89.  As modified by Judge Frank, then, the claim must be considered in light of appropriate therapeutic interests as well as relevant safety and security concerns.

"<u>Turner</u> employs a four-factor test to resolve this inquiry: (1) whether there is a rational relationship between the regulation and the legitimate government interest advanced; (2) whether the inmates have available alternative means of exercising the right; (3) the impact of the

accommodation on prison staff, other inmates, and the allocation of prison resources generally; and (4) whether there are ready alternatives to the regulation. <u>Freeman v. Texas Dept. of Criminal Justice</u>, 369 F.3d 854, 860 (5th Cir. 2004) (internal citations omitted).

Applying the first of the four <u>Turner</u> factors, the Defendants argue that CCUSO's requirements for attending church in the community, including meeting with the Pastor, disclosing sex offender history, arranging any needed safety plan, and obtaining the Pastor's consent are rationally related to helping the patient transition back into society. Defendants further argue that:

> Patients in transitional release must also complete outing requests for each outing, articulating where the patient intends to go, why, and for how long. The process of reintegrating into the community begins with escorted visits and eventually the patient can come and go with spot checks to ensure he is where he says he will be. Note that ma[n]y of the outing requests include "spot check." This is rationally related to the twin goals of safety and successful reintegration. Escorted visits and spot checks require staff to be available and to be present in the area where the patient is. This is a larger burden for visits that are farther away than for closer visits.

Docket No. 25, Att. 2, p. 7-8.

Applying the second _Turner_ factor, the Defendants have demonstrated that Mr. Altman has an alternate means of exercising his faith, including attending CCUSO's non-denominational service (officiated by Pastor Stout, a Baptist). Further, CCUSO would allow Mr. Altman to attend a Baptist church in Storm Lake, which is closer and requires less resources, but that church chose to reject CCUSO patients. Mr. Altman has attended services at the Faith Bible church in Storm Lake.

The third _Turner_ factor relates to allocation of resources while the fourth _Turner_ factors ask about ready alternate policies. CCUSO patients, by definition, have been found to have mental abnormalities leaving them likely to re-offend. Almost all have a history of violent crimes. Accordingly, there is no dispute that CCUSO must maintain adequate levels of security. CCUSO's security based policy is that when transitional release patients travel into the community, staff either needs to accompany them or do spot checks to make sure the patients are where they are supposed to be. Defendants argue that CCUSO must maintain staff who

can handle these duties, which is why outing requests are sometimes denied and outings close to the facility are favored over outings far away. Accordingly, considering allocation of limited resources, CCUSO should have the discretion to approve outings near to Cherokee as opposed to farther away. Defendants maintain that there simply is no ready alternative policy that Mr. Altman does not have access to. Finally, the Defendants point out that they denied Mr. Altman's outings to Fort Dodge after his son was arrested - and keeping patients from crime and criminal associates is an important security interest. Moreover, Mr. Altman did not submit any request to go to Fort Dodge after 2012, so there is no indication in the record whether he could resume occasional outings to Fort Dodge after the situation with his son resolved.[8]

The Defendants are correct. Mr. Altman cannot allege a genuine issue of fact that, applying the <u>Turner</u> analysis, as modified by Judge Frank, could support his allegation that his free exercise rights were infringed. In his deposition, Mr. Altman admitted that the primary reason he wanted to attend

---

[8] Of course, the issue of prospective, alternate remedies is moot because Mr. Altman's release to the Fort Dodge area has been approved by the state court.

the church in Fort Dodge was to be near his family and
friends. While being close to your family is certainly a
rational desire, it is hard to argue that CCUSO's denial of
Mr. Altman's request to travel to Fort Dodge amounts to a free
exercise violation. There simply are no genuine issues of
material fact that, under the Turner factors, discussed above,
would show CCUSO's policy is invalid. As this Court noted in
Mead v. Palmer, No. 13-CV-4017-DEO, 2014 WL 2557673, at *5
(N.D. Iowa 2014), CCUSO, and CCUSO Defendants, do not have the
responsibility, or the power, to make sure every patient gets
access to the exact church and pastor that they may want all
the time. Rather, the responsibility is to do "all they can"
to avoid Turner conflicts. Id. In this case, they have done
that. Accordingly, there is no genuine issue of material fact
and the Defendants' Motion for Summary Judgment must be
granted.

**B. Retaliation**

The Defendants also argue that Mr. Altman's retaliation
claim should be dismissed. In the Second Amended Complaint,
Mr. Altman argues:

> Altman was retaliated against after he
> exercised his right to petition the Court

20

> for discharge...    Before  filing  such
> Petition, Altman was in the transitional
> phase of the program and was regularly
> allowed to sign out for [various events]...
> After Altman pursued his right to petition
> the Court for discharge pursuant to Iowa
> Code Section 229A.8, the Defendants have
> routinely denied his requests...

Docket No. 16, p. 6.   Both parties agree that to show
retaliation, a plaintiff has to show (a) that he exercised a
constitutionally protected right; (b) that he was disciplined;
and (c) exercising that right was the motivation for the
discipline.   Haynes v. Stephenson, 588 F.3d 1152, 1155 (8th
Cir. 2009).

There is really no dispute that filing a court petition
is a protected right.   And for the purposes of this
allegation, the Court will assume, without deciding, that
denial of trips to Fort Dodge is discipline.   But, Mr. Altman
has failed to allege any facts to support the third factor.
No facts or allegations tie the right he exercised to the
discipline he allegedly received.[9]   Instead, the Defendants
have offered a legitimate, non-retaliatory reason for the
denial of trips to Fort Dodge.   As discussed above, Mr.

---

[9]   Other than a vague temporal correlation.

Altman's son was arrested on a serious charge, and the Defendants determined that in the interest of Mr. Altman's treatment, it was best to keep him out of that volatile situation.

There is some confusion about whether Mr. Altman's claim related to riding at the back of the van is related to discrimination or retaliation. As set out above, Mr. Altman's brother made a comment and in response to that comment, Defendants made Mr. Altman sit in the back of a van (one time). Although being made to sit in the back of a vehicle has a long racial history, in this situation, there simply is no evidence to support a claim of either discrimination or retaliation. Regarding retaliation, Mr. Altman does not allege that is a right that he exercised, nor can he tie exercising that right to the alleged punishment in any meaningful way. Regarding racial discrimination, there is no alleged evidence that ties Mr. Altman sitting in the back of the van – one time – to a racial motivation. There really is not even much of a direct allegation of racial discrimination in Mr. Altman's testimony, and even if there were, an allegation alone is not enough for a claim to survive summary

judgment.  Instead, we have testimony that the one time Mr. Altman rode in the back of the van, it was because a different patient had already claimed the front seat, which is an entirely reasonable explanation for a one time event such as this.

Because the Plaintiff alleges no issue of material fact on the retaliation claim, the Court must grant the Defendants' Motion for Summary Judgment.

## C. Racial Discrimination

Mr. Altman alleges that he was transferred from phase four of treatment to phase three of CCUSO when he was found to have a "a counter-therapeutic movie." Mr. Altman alleges that a Caucasian patient, who was found in possession of pornographic materials, was not transferred down a phase. Mr. Altman also alleges that although he could not find housing outside of CCUSO, other, Caucasian patients could.

Defendants argue that Mr. Altman has failed to state a claim.  Prisoners are protected under the Equal Protection Clause of the Fourteenth Amendment from invidious discrimination based on race.  Wolff v. McDonnell, 418 U.S. 539, 556 (1974).  To state a claim of racial discrimination,

23

the prisoner must show that similarly situated inmates were treated differently and that this difference in treatment bears no rational relation to any legitimate penal interest. Lee v. Hood, No. 1:11-CV-00008-SWW, 2011 WL 4369305, at *2 (E.D. Ark. 2011), report and recommendation adopted, No. 1:11-CV-00008-SWW, 2011 WL 4369255 (E.D. Ark. 2011). Plaintiff must identify affirmative evidence from which the fact-finder can find proof of discriminatory motive to survive summary judgment. Lewis v. Jacks, 486 F.3d 1025, 1028 (8th Cir. 2007).

In his brief, Mr. Altman barely mentions the racial discrimination claim, and during the hearing, his attorney implicitly conceded that there is no evidence of any racial pretext in the incidents described by Mr. Altman. Accordingly, Mr. Altman has failed to create a genuine issue of material fact regarding his racial discrimination claim. Additionally, even if he had alleged a valid racial discrimination claim, it would still fail because, as stated in the Defendants' brief:

> [e]ven if bare allegations of persons with different races (and different circumstances) receiving different treatment is sufficient to meet the first

element of the burden shifting frame work, Defendants have offered legitimate nondiscriminatory reasons for each of the incidents about which Mr. Altman complains.

Docket No. 30, p. 3. Accordingly, the Court must grant the Defendants' Motion for Summary Judgment.

## D.  Qualified Immunity

The Defendants also argue they are entitled to a defense of qualified immunity because government officials are entitled to qualified immunity for the performance of discretionary functions. <u>Davis v. Hall</u>, 375 F.3d 703, 711 (8th Cir. 2004). Qualified immunity exists "to protect public officials from the 'broad-ranging discovery' that can be 'peculiarly disruptive of effective government.'" <u>Anderson v. Creighton</u>, 483 U.S. 635, 646 (1987) (quoting <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 817 (1982)).

To defeat the Defendants' claim of qualified immunity, the Plaintiff must show how each Defendant's individual conduct violated a "clearly established statutory or constitutional right of which a reasonable person would have known." <u>Id.</u> The Supreme Court has established a two step sequential evaluation process to resolve questions of

qualified immunity.[10]  <u>Saucier v. Katz</u>, 533 U.S. 194, 201
(2001).  The "'threshold question'" is whether the facts,
taken in a "'light most favorable to the party asserting the
injury,'" demonstrate the defendant's "'conduct violated a
constitutional right'" of the plaintiff.  <u>Scott v. Harris</u>, 550
U.S. 372, 377 (2007).  If there is a "violation of
constitutional right, 'the next, sequential step is to ask
whether the right was clearly established . . . in light of
the specific context of the case.'"  <u>Id.</u>

The first question in the sequential evaluation process
is straight forward and merely asks if there is a
constitutional violation under prevailing law.  The second
question in the sequential evaluation process requires that
the "contours of the right . . . be sufficiently clear" such
"that a reasonable official would understand that what he is
doing violates that right."  <u>Saucier</u>, 533 U.S. at 202.  "If
the law did not put the [official] on notice that his conduct
would be clearly unlawful," a motion to dismiss "based on

---

[10]  More recently, in <u>Pearson v. Callahan</u>, the Supreme
Court ruled that the sequential evaluation process outlined in
<u>Saucier</u> was not mandatory; lower courts retain discretion
whether to follow the <u>Saucier</u> procedure.  555 U.S. 223, 236
(2009).

qualified immunity is appropriate." <u>Id.</u> While the first and second steps are quite similar, the second step adds an additional dimension in that "reasonable mistakes can be made as to the legal constraints on particular" official conduct, regardless of whether or not there was an actual constitutional violation. <u>Id.</u>, at 205.

In this case, even if there were a free exercise constitutional violation, the Defendants would be entitled to qualified immunity for money damages because the alleged violations were not sufficiently clear to put the Defendants on notice.[11] There simply is no statutory or case law that would suggest to the Defendants that they had a constitutional obligation to allow Mr. Altman to travel to a specific church in Fort Dodge.

---

[11] The Court will not discuss the Defendants' qualified immunity claim regarding racial discrimination and retaliation because Mr. Altman's claims regarding those two issues clearly fail on the merits. However, the Court notes that the prohibition against both racial discrimination and retaliation are well defined. Accordingly, the Defendants' are on notice that committing either are constitutional violations, and the Defendants would not be entitled to qualified immunity if Mr. Altman had a valid claim.

### E.  Other Issues

Because the Defendants' Motion for Summary Judgment must be granted based on the issues discussed above, the Court does not need to consider the other issues raised in their Motion.

## VII.  CONCLUSION

For the reasons set out above, Defendants' Motion for Summary Judgment, Docket No.25, is **GRANTED**.  The Plaintiff's Complaint is dismissed.

**IT IS SO ORDERED** this 25th day of March, 2015.

_____
Donald E. O'Brien, Senior Judge
United States District Court
Northern District of Iowa